UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FRONTIER BANK,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. CLEMENTZ, RANDY E. DEKLYEN, LUCILLE M. DEYOUNG, JOHN J. DICKSON, ROBERT J. DICKSON, DAVID A. DORSEY, WILLIAM H. LUCAS, JAMES W. RIES, ROBERT W. ROBINSON, LYLE E. RYAN, DARRELL J. STORKSON, AND MARK O. ZENGER,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND**<br><br>**JURY DEMAND** |

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Frontier Bank of Everett, Washington ("FDIC-R"), for its Complaint, states as follows:

COMPLAINT AND JURY DEMAND - PAGE 1

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

1

## I.   **INTRODUCTION**

2    1.    The Federal Deposit Insurance Corporation ("FDIC") brings this case in its capacity as

3    Receiver for Frontier Bank ("Frontier" or "Bank") pursuant to authority granted by 12 U.S.C.

4    § 1821.

5    2.    The FDIC-R seeks to recover damages in excess of $46 million that former Frontier

6    officers Randy E. DeKlyen ("DeKlyen"), John J. Dickson ("J. Dickson"), David A. Dorsey

7    ("Dorsey"), James W. Ries ("Ries"), Robert W. Robinson ("Robinson"), and Lyle E. Ryan ("Ryan")

8    (collectively, the "Officers"); and non-officer directors Michael J. Clementz ("Clementz"),[1] Lucille

9    M. DeYoung ("DeYoung"), Robert J. Dickson ("R. Dickson"), William H. Lucas ("Lucas"), Darrell

10   J. Storkson ("Storkson"), and Mark O. Zenger ("Zenger") (collectively, the "Non-Officer

11   Directors") (collectively, the Officers and the Non-Officer Directors are referenced herein as

12   "Defendants"), caused the Bank to incur.  The FDIC-R reserves the right to amend this Complaint

13   to describe additional damages.

14   3.    The Officers breached their fiduciary duties to Frontier and were negligent and grossly

15   negligent by, among other things, recommending, presenting for approval, and/or approving, in

16   violation of the Frontier Bank Loan Policy ("Loan Policy") and prudent, safe, and sound lending

17   practices, at least 11 loans between March 2007 and April 2008 ("Loans").  The Officers are liable

18   for the damages that the Bank suffered as a result of their negligence, gross negligence, and

19   breaches of fiduciary duties.

20   4.    The Non-Officer Directors breached their fiduciary duties to Frontier and were grossly

21   negligent by, among other things, approving the Loans in violation of the Loan Policy and prudent,

22   safe, and sound lending practices.  The Non-Officer Directors are liable for the damages that the

23   Bank suffered as a result of their gross negligence and breaches of fiduciary duties.

24   _____

25   [1]   Although Clementz was an officer of Frontier from July 2000 to April 2003 and again from December 2008 to December 2009, he was not an officer at the time of the transactions at issue in this case.

COMPLAINT AND JURY DEMAND - PAGE 2

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

1    5.    The FDIC-R seeks recovery of damages caused by the Officers' negligence, gross

2    negligence, and breaches of fiduciary duties and the Non-Officer Directors' gross negligence and

3    breaches of fiduciary duties in causing the Bank to violate its own policies and prudent, safe, and

4    sound banking practices.  In this lawsuit, the FDIC-R does not seek to collect upon outstanding

5    loans, but rather seeks to collect damages flowing from the Defendants' negligence and/or gross

6    negligence and breaches of fiduciary duties, which include, among other things, lost operating

7    capital, lost profits, and lost investment opportunities.

8                              **II.    PARTIES**

9    6.    Plaintiff is the FDIC in its capacity as Receiver of Frontier, pursuant to 12 U.S.C.

10   § 1811, *et seq.*  Prior to its failure, Frontier was insured by the FDIC.  On April 30, 2010, the Bank

11   was closed by the Washington Department of Financial Institutions, Division of Banks ("WDFI"),

12   and the FDIC was appointed as Receiver.  Under 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R has,

13   among other powers, all rights, titles, powers, and privileges of Frontier, and of account holders,

14   depositors, and stockholders with respect to Frontier and its assets.

15   7.    Defendant Clementz is a former officer and director of the Bank.  Clementz was an

16   Executive Vice President ("EVP") of Frontier from July 2000 to April 2003, and a director from

17   August 2000 to December 2009.  Clementz was a member of the Bank's Directors' Loan

18   Committee ("DLC") from April 2005 to December 2009.  He succeeded J. Dickson as Chief

19   Executive Officer ("CEO") of Frontier and was a member of the Executive Loan Committee

20   ("ELC") from December 2008 to December 2009.  Based on information and belief, Clementz

21   currently resides in Indianola, Washington.

22   8.    Defendant DeKlyen is a former officer of the Bank.  DeKlyen was Frontier's EVP for

23   Senior Branch Administration from 2007 to 2008 and a member of the ELC from April 2007 to

24   April 2010.  DeKlyen was EVP and Senior Credit Administrator from March 2009 until the Bank

25   closed.  Based on information and belief, DeKlyen currently resides in Bothell, Washington.

COMPLAINT AND JURY DEMAND - PAGE 3

9.     Defendant DeYoung is a former director of the Bank.  She was a director from April 1997 until the Bank closed and a member of the DLC from December 2004 to March 2010.  Based on information and belief, DeYoung currently resides in Woodinville, Washington.

10.     Defendant J. Dickson is a former officer and director of the Bank, and was CEO of the Bank when all of the Loans were approved.  J. Dickson was Frontier's Senior Vice President ("SVP") and Cashier from 1993 to 1996, SVP of Financial Control from 1997 to 2003, CEO from May 2003 to December 2008, and President from December 2008 to March 2010.  He also was a member of the ELC from April 2003 to March 2010 and a member of the DLC from April 2005 to March 2010.  Based on information and belief, J. Dickson currently resides in Everett, Washington.

11.     Defendant R. Dickson is a former officer and director of the Bank.  He founded Frontier in 1978, was President and CEO of the Bank from 1978 to May 2003, and was a director and Chairman of the Board from 1978 to December 2008.  R. Dickson also was a member of the DLC from December 2004 to December 2008, and was Chair of the DLC from 2006 to December 2008.  Based on information and belief, R. Dickson currently resides in Everett, Washington.

12.     Defendant Dorsey is a former officer of the Bank.  Dorsey was Frontier's SVP and Manager from October 2001 to January 2009 and EVP of the Real Estate Division from February 2009 until the Bank closed.  Dorsey also was a member of the ELC from April 2004 to April 2010.  Based on information and belief, Dorsey currently resides in Everett, Washington.

13.     Defendant Lucas is a former director of the Bank.  Lucas was a director from 1978 to January 2009 and a member of the DLC from December 2004 to December 2008.  Based on information and belief, Lucas currently resides in Everett, Washington.

14.     Defendant Ries is a former officer of the Bank.  Ries was a member of the ELC from April 2003 to August 2009 and President of the Real Estate Division from May 2003 until the Bank closed.  Based on information and belief, Ries currently resides in Everett, Washington.

COMPLAINT AND JURY DEMAND - PAGE 4

15.     Defendant Robinson is a former officer of the Bank.  Robinson was Frontier's SVP for Credit Administration from August 2000 to May 2003 and Chief Credit Officer ("CCO") from May 2003 until the Bank closed.  Robinson also was a member of the ELC from April 2003 to April 2010.  Based on information and belief, Robinson currently resides in Bainbridge Island, Washington.

16.     Defendant Ryan is a former officer of the Bank.  Ryan was Frontier's EVP for Branch Administration from 2001 to 2002, President and Chief Operating Officer ("COO") from May 2003 to January 2007, President and Chief Banking Officer from January 2007 to December 2008, EVP for Senior Branch Administration from December 2008 to October 2009, and EVP for Private Client Services from October 2009 until the Bank closed.  Ryan also was a member of the ELC from April 2003 to July 2009.  Based on information and belief, Ryan currently resides in Everett, Washington.

17.     Defendant Storkson is a former director of the Bank.  Storkson was a director from April 1997 until the Bank closed, and was a member of the DLC from December 2004 to December 2009.  Based on information and belief, Storkson currently resides in Mukilteo, Washington.

18.     Defendant Zenger is a former director of the Bank.  Zenger was a director from June 2005 until the Bank closed, and was a member of the DLC from June 2005 to March 2010.  Based on information and belief, Zenger currently resides in Edmonds, Washington.

### III.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811, *et seq.*, 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC is a corporation organized and existing under the laws of the United States of America, and brings this action in its receivership capacity.  Actions to which the FDIC is a party are deemed to arise under the laws of the United States.  The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law.  12 U.S.C. § 1819.

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

20.     This Court has personal jurisdiction over the Defendants, who at all relevant times conducted business in the state of Washington.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts charged herein occurred in this District and the FDIC-R's claims arose in this District.

## IV.     FACTUAL BACKGROUND

22.     Frontier was formed in 1978 and was headquartered in Everett, Washington. Beginning in 2003, Frontier instituted an aggressive growth strategy centered on increased commercial real estate ("CRE") lending with an emphasis on acquisition, development, and construction ("ADC") loans.  From 2005 to 2007, Frontier's total real estate loans increased by more than 58% from $2.03 billion to $3.22 billion.

23.     By 2009, Frontier had the highest concentration of ADC loans relative to total assets of any insured bank in the state of Washington.  As of April 2010, the Bank was the largest commercial bank headquartered in western Washington, with approximately $3.6 billion in assets and approximately $3.1 billion in deposits.  On April 30, 2010, the WDFI closed Frontier and the FDIC was appointed as Receiver.

24.     Each of the Officers was negligent and grossly negligent and breached his fiduciary duties to Frontier by, among other things, recommending, presenting for approval, and/or approving certain Loans in violation of the Loan Policy and prudent, safe, and sound lending practices.  Each of the Non-Officer Directors was grossly negligent and breached his or her fiduciary duties by, among other things, approving certain Loans in violation of the Loan Policy and prudent, safe, and sound lending practices.  Defendants' acts and omissions caused Frontier to suffer damages in excess of $46 million.

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

**A.    Defendants Knew that Frontier Was Concentrated in CRE and ADC Loans and Faced Risk of Losses in a Declining Real Estate Market**

25.    During the time period in which the Defendants approved the Loans, they knew or should have known that Frontier's lending was concentrated in CRE and ADC loans.  Because of this concentration and Frontier's potential exposure to large losses on its portfolio of CRE and ADC loans from a decline in the real estate market, Defendants needed to exercise more care when recommending, presenting for approval, and/or approving CRE and ADC loans, including the Loans.

26.    For example, during a February 2006 meeting of Frontier's Board of Directors, R. Dickson expressed concerns regarding the Bank's increasing level of real estate construction loans. Director J. Dickson acknowledged that Frontier's loan growth continued to exceed the increase in deposits, and suggested that the Board consider whether to "close down the loan growth spigot." Rather than curtail lending by closing that "spigot," the Board simply approved an increase in the Bank's loan loss reserve and the Defendants continued to approve CRE and ADC loans.

27.    Over the weekend of September 15 and 16, 2006, Frontier conducted a Directors Planning Session, during which the directors identified one of Frontier's "strengths" as a "[s]trong real estate niche."  That niche consisted of making CRE and ADC loans.  The directors identified two of Frontier's "weaknesses" to be: "We are thin – limited resources and time" and "We're getting bigger."  During the September 2006 Directors Planning Session, the directors also expressly recognized that one of the "threats" to the Bank was "[t]he housing market."  The directors also recognized another threat, "Regulation – new heat on commercial real estate lending. We may have to change the way we do business."

28.    Frontier's Officers also had actual and constructive notice of warnings in banking and financial publications about the impending decline of the real estate market.  For example, from 2005 until the Bank failed, Frontier subscribed to a publication called "Real Estats," which provided Bank management, including certain Officers, with reports and "special letters" with county-by-

COMPLAINT AND JURY DEMAND - PAGE 7

1   county data on the Washington real estate market and predictions of the future performance of that

2   market.  In February 2006, the publisher of Real Estats personally made a presentation to Robinson,

3   Ries, and other Frontier personnel, warning them that the real estate market was going to have a

4   serious decline and discussing appropriate steps that should be taken to prepare for the impending

5   market decline.  In a March 1, 2006, "special letter" to the Bank, Real Estats cautioned that "the

6   first 'domino' to fall in our markets will be raw land . . . .  [L]enders need to underwrite and

7   determine risk most carefully or they, too, will end up with dirt."  Another "special letter" dated

8   March 20, 2006 warned, "There is so much happening that will make housing falter tomorrow, that

9   it is imperative you protect your business today."

10        29.    Over the weekend of September 22 and 23, 2007, Frontier conducted another

11   Directors Planning Session.  During this session, Robinson and Ries presented a Real Estats

12   overview of current real estate statistics, and the Bank's directors again highlighted as one of their

13   "concerns" the fact that Frontier was "[h]ighly concentrated in real estate."

14        30.    The publisher of Real Estats also sent Bank management, including Robinson and

15   Ries, periodic e-mails warning about the anticipated decline of the housing market, including the

16   housing market in Washington.  Communications by certain of the Defendants relating to Real

17   Estats, however, were often dismissive.  For example, in October 2007, Ries, the President of

18   Frontier's Real Estate Division, wrote to Real Estats, copying Robinson, Frontier CCO, stating,

19   "[D]o you think that you could find any positive information out there to report, the doom and

20   gloom is getting old[.]"  Following this email, Robinson and Ries presented for approval and/or

21   approved four of the ADC Loans discussed below.

22        31.    The Defendants knew that the Bank was highly exposed in the area of CRE and ADC

23   loans that would be negatively affected by a decline in the real estate market, and thus knew or

24   should have known that they needed to exercise a heightened degree of care when approving such

25   loans.  Instead of exercising heightened care, however, the Defendants did just the opposite,

COMPLAINT AND JURY DEMAND - PAGE 8

1   repeatedly failing to follow their own policies.  Moreover, the Defendants incentivized the Bank's

2   loan officers to make risky loans by tying those officers' bonus compensation to loan originations.

3   This was another reason why the Defendants should have been especially cautious in reviewing and

4   approving loans.

5       **B.**    <u>**Frontier's Loan Policy**</u>

6       32.    Throughout the time period relevant to the FDIC-R's claims, the Loan Policy provided

7   guidelines and standards for underwriting, reviewing, and approving various categories of loans.

8   All of the Loans described in this Complaint were categorized under the Loan Policy as

9   "Construction Loans," which included: (1) loans for residential and/or commercial real estate

10   development; (2) loans for residential and/or commercial real estate acquisition; and (3) working

11   capital loans for real estate acquisition and/or development.

12       33.    Because of the risk associated with Construction Loans, Frontier's Loan Policy

13   included very stringent requirements for this type of loan.  There were three separate levels of

14   underwriting and approval requirements.  The first level applied to all loans that the Bank extended,

15   regardless of type; the second level applied to all real estate loans; and the third level applied

16   specifically to Construction Loans.  Requirements at each level of underwriting and approval that

17   are relevant to the FDIC-R's claims are discussed below.

18       ***Requirements Applicable to All Loans***

19       34.    The Loan Policy provided, among other things, the following primary areas of

20   consideration for all loan applications:

21           a.    borrower and/or guarantor creditworthiness;

22           b.    the loan repayment ability of the borrower and/or guarantor, and primary and

23           secondary repayment sources;

24           c.    the purpose of the loan, including that the loan must be sound and not

25           speculative;

COMPLAINT AND JURY DEMAND - PAGE 9

d.    the nature and value of the collateral, properly margined;

e.    economic conditions and trends in the area, industry, and firm; and

f.    legal and regulatory requirements.

**Requirements Applicable to All Real Estate Loans**

35.    The Loan Policy also established guidelines and standards for underwriting, reviewing, and approving all real estate loans. For every real estate loan application, the Loan Policy required a loan officer to evaluate the applicant's income relative to the applicant's financial obligations, verify sources of reported funds, evaluate the collateral, and analyze the loan terms. The loan officer would then present this information, along with additional details, in a loan memorandum ("Loan Memo") for the recommending and approving authorities to review. Among other things, the Loan Memo would state the purpose of the loan, the proposed pricing and term, the names of the borrower(s) and guarantor(s), a description of the collateral and its value, the total debt to the borrower(s), a summary of the balance sheets and gross incomes of the borrower(s) and guarantor(s), and other information as required by the Loan Policy. For any significant exceptions from the Bank's lending standards, policies, procedures, or controls in connection with a particular real estate loan, the DLC's minutes and/or the Loan Memo supporting the loan were required to note the following:

a.    the reasons for the departure from the Bank's policy;

b.    a detailed description of how such departure contrasted with the Bank's policy;

c.    suggestions for corrective action for any noted deficiencies; and

d.    additional information that would assist Frontier's directors and management to make an informed decision on the loan.

36.    The Loan Policy also established guidelines for, among other things, minimum equity contributions and maximum loan-to-value ("LTV") ratios for real estate loans, including the following types of Construction Loans: raw land loans, land acquisition and development loans, and

COMPLAINT AND JURY DEMAND - PAGE 10

1    other general Construction Loans.  The guidelines for raw land acquisition loans included:

2    minimum hard equity[2] of 10% (35% if owned less than 12 months); minimum appraised equity[3] of

3    35%; maximum LTV ratio of 65%; and maximum supervisory LTV ratio[4] of 65%.  The guidelines

4    for land acquisition and development loans were: minimum hard equity of 10%; minimum

5    appraised equity of 30%; maximum LTV ratio of 70%; and maximum supervisory LTV ratio of

6    75%.  For other types of Construction Loans, the guidelines were: minimum hard equity of 10%;

7    minimum appraised equity of 30%; maximum LTV ratio of 70%; maximum LTV ratio of 90%

8    based on cost if the LTV ratio based on appraised value was greater than 70%; and maximum

9    supervisory LTV ratio of 80%.  Loans in excess of their maximum supervisory LTV ratios required

10   special tracking by the Board of Directors and were subject to a strict aggregate limit.  The

11   aggregate amount of all such loans was not to exceed 100% of total capital, and, within this amount,

12   the total amount of loans for commercial, agricultural, multi-family, and other non-1-4 family

13   residential properties was not to exceed 30% of total capital.

14          37.    As a precondition to granting any real estate loan, the Loan Policy also required at

15   least one written appraisal of any property pledged as collateral that, among others:

16          a.     was prepared by a qualified appraiser approved by the Bank;

17          b.     was prepared for a federally insured financial institution;

18          c.     was prepared in accordance with the Bank's Real Estate Appraisal and

19                 Evaluation Policies and Procedures ("Appraisal Policy"); and

---

[2]  The Loan Policy did not define the term "hard equity."  An example of "hard equity" in FDIC regulations
is "cash or unencumbered investment in the underlying property."  Interagency Guidelines for Real Estate
Lending Policies, 12 C.F.R. pt. 365, subpt. A, app A.

[3]  The Loan Policy did not define the term "appraised equity."  In the context of construction lending, the
term "appraised equity" typically means the appraised value of the real property less the aggregate amount of
debt that is secured by the real property.

[4]  The Loan Policy provided supervisory LTV ratio limits as an additional underwriting safeguard.  If an
application for a loan indicated that the LTV would exceed the supervisory LTV limit, the loan officer was
required to document the reasons for the requested exception to the Loan Policy and offer a recommendation.

COMPLAINT AND JURY DEMAND - PAGE 11

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

1        d.     disclosed the market value of the security offered by the borrower along with

2            sufficient information to substantiate the market value of the security.

3       38.    Under Frontier's Appraisal Policy, an updated appraisal could be required if an

4 internal evaluation indicated a deterioration in the value of the collateral.

5       39.    In addition to evaluating the transaction-specific characteristics of loans, the Loan

6 Policy also required the Bank's ELC and DLC to consider real estate market data gathered by the

7 Bank's directors and officers when deciding whether to approve real estate loans.  For example, the

8 Loan Policy required the Bank's officers and directors to monitor and evaluate the real estate market

9 conditions in the Bank's lending area including, but not limited to:

10        a.     demographic indicators, including population and employment trends;

11        b.     current and projected vacancy, construction, and absorption rates;

12        c.     current and projected lease terms, rental rates, and sales prices;

13        d.     current and projected operating expenses for different types of projects; and

14        e.     economic indicators, including trends and diversification of the lending area;

15       40.    The Loan Policy also required officers and directors to monitor and evaluate local,

16 regional, and national real estate market conditions by reviewing available sources including, but

17 not limited to:

18        a.     newspapers and industry newsletters;

19        b.     reports and press releases issued by universities and research organizations;

20            and

21        c.     economic indicators, such as unemployment statistics, housing starts, building

22            permits issued, vacancies, etc.

23    ***Requirements Applicable to All Construction Loans***

24       41.    The Loan Policy required all Construction Loans to be secured by a first position

25 mortgage or deed of trust.

COMPLAINT AND JURY DEMAND - PAGE 12

1    42.    For Construction Loans dependent upon third-party financing, the Loan Policy

2    required a take-out commitment issued by the lender providing the third-party financing.

3    43.    The Loan Policy required the following documentation, among others, for

4    Construction Loans:

5          a.    cost estimates, including land and construction costs, off-site expenses, legal

6                and insurance expenses, and loan interest;

7          b.    an appraisal report with a feasibility and marketability evaluation;

8          c.    a copy of the officially approved plans and specifications;

9          d.    an estimate of income and expenses for rental property; and

10          e.    a construction loan agreement.

11    44.    The Loan Policy also required consideration of, among others, the risks that:

12          a.    the borrower was unable to complete construction or development on time

13                and/or within projected cost;

14          b.    the appraisal did not accurately reflect the true value of the appraised asset;

15          c.    rents, vacancies, or operating expenses could exceed projected amounts;

16          d.    the collateral was insufficient; and

17          e.    the borrower was unable to service the debt.

18    45.    Before an approval decision could be made, the Loan Policy required an appraisal with

19    special emphasis on feasibility, marketability, construction costs, and adequacy of the plans and

20    specifications.

21    ***Loan Approval Structure and Limits***

22    46.    At all relevant times, Frontier had a tiered loan approval process.  Primary lending

23    authority was vested in the DLC, which could approve loans up to the Bank's legal lending limit.

24    The DLC was comprised of the CEO and six other Bank directors.  Four members of the DLC

25    constituted a quorum for the committee's business.  A majority vote of the present members was

COMPLAINT AND JURY DEMAND - PAGE 13

1   required for approval. In addition, the CEO's vote was necessary to approve any loan presented to
2   the DLC.

3       47.    The DLC delegated its lending authority, up to specified limits, to the ELC, CEO,
4   President, and CCO. The lending authority of the ELC was $10 million. The ELC was comprised
5   of the CEO, President, CCO, President of the Real Estate Division, and Senior Branch
6   Administrator. A majority vote of these members was required for loan approval. In addition, any
7   loan submitted to the ELC for approval required the CEO's vote of approval in order to be funded.
8   Loans in excess of the ELC's lending authority were only considered by the DLC if the ELC first
9   considered the loan and decided to present it to the DLC for approval.

10      48.    The DLC and ELC generally received the following materials for purposes of
11  evaluating whether to approve a loan: (a) the Loan Memo, as described in paragraph 35 above; and
12  (b) standardized personal and business financial statements for the borrowers and guarantors. The
13  DLC and ELC also had access to loan files, which contained the collateral appraisal, an appraisal
14  review, borrower and/or guarantor tax returns, and other information.

### C.    The Defendants' Negligent and/or Grossly Negligent Acts and Breaches of Fiduciary Duties

17      49.    As officers and/or directors of Frontier, the Defendants had duties to follow Frontier's
18  Loan Policy and to exercise due care in recommending, presenting for approval, and/or approving
19  the Loans.

20      50.    Between March 2007 and April 2008, the Defendants left open the "loan growth
21  spigot" and breached their duties by causing the Bank to approve loans that would not have been
22  made had the Defendants complied with Frontier's Loan Policy, followed prudent, safe, and sound
23  lending practices, and conducted and/or required the necessary due diligence, including basic loan
24  review procedures.

25      51.    The Defendants' repeated violations of Frontier's Loan Policy and prudent, safe, and
    sound lending practices occurred throughout the lending process. The Officers who recommended,

COMPLAINT AND JURY DEMAND - PAGE 14

1    presented for approval, and/or approved the Loans were negligent and grossly negligent and

2    breached their fiduciary duties.  The Non-Officer Directors who approved the Loans were grossly

3    negligent and breached their fiduciary duties.

4        52.    But for the Defendants' wrongful conduct, Frontier would not have made the Loans on

5    the terms presented, as alleged below.

6    ***Borrowers A-C[5]***

7        53.    On or about October 22, 2007, on the recommendation of Dorsey, the ELC, including

8    J. Dickson, Ries, Robinson, and Ryan, approved a $5.5 million Construction Loan to three

9    individual borrowers, Borrower A, Borrower B, and Borrower C, (the "Borrowers A-C loan").

10       54.    On or about October 29, 2007, the Bank disbursed approximately $5.0 million of the

11   Borrowers A-C loan.

12       55.    The Loan Memo for the Borrowers A-C loan stated that the purpose of the loan was to

13   support the secured real estate lending activities of LLC A, which was a closely held entity that

14   specialized in making bridge loans to large developers and which was partially owned by Borrowers

15   A, B, and C.  In particular, this $5.5 million loan was to be used to provide a carry on other loans

16   made by LLC A related to the development of the Streamline Tower in Las Vegas, Nevada.  On the

17   face of the Loan Memo, the purpose of the loan was speculative and unsound.

18       56.    The Loan Memo provided that the primary and secondary repayment sources were to

19   be, in order, investment income and sale of real estate investments.

20       57.    The Loan Memo also provided that the Borrowers A-C loan would be secured by a

21   first lien on one of the borrowers' single family residence in Kirkland, Washington and by 39 shares

22

23   [5]   Borrowers A, B, C, and D referenced herein represent individual borrowers whose names have been
     withheld to protect their privacy. LLCs A, B, C, D, and E referenced herein were named after individual
24   members of the LLCs or their memberships were transparent.  The names of these LLCs have been withheld
     to protect the privacy of their individual members. The names of these LLCs and borrowers will be provided
25   once an appropriate protective order is in place.

COMPLAINT AND JURY DEMAND - PAGE 15

of O.D. Fisher Investment Company ("O.D. Fisher") restricted stock that the Loan Memo stated

would *not* be sold to repay the loan.

58.    In recommending or approving the Borrowers A-C loan, Defendants J. Dickson,

Dorsey, Ries, Robinson, and Ryan, among other things:

      a.    Failed to consider the inadequacy of the repayment sources.  The Loan Memo

described the only repayment sources as "Investment income and sale of RE

investments," stating "Monthly interest will be paid from investment income"

and the "source of repayment for the remaining principal balance will come

from the sale of the [Streamline Tower in Las Vegas, Nevada] where the funds

are invested."  The Loan Memo provided that LLC A was to increase its

ownership in the project in order to receive a draw of 30% of net profits that

was supposedly to be paid out at an unspecified date during the fourth quarter

of 2008, which LLC A would use to "repay the remaining loan balance at that

time."  However, the term of the Borrowers A-C loan was only one year,

ending on October 5, 2008, making it far from certain that LLC A would be

able to repay the loan on schedule from the anticipated payment of profits

relating to the Streamline Tower project.  In addition, the Loan Memo failed to

analyze the status of the Las Vegas condominium project and the Las Vegas

real estate market, both of which were critically important to LLC A's ability

to receive profits that could be used to pay off the balance of the loan.  To

make matters worse, even though LLC A was the identified beneficiary of the

loan and should have been a formal borrower or guarantor of the loan, the loan

documents did not bind LLC A in any way as a borrower or guarantor.  As a

result, the Bank was left with no legal recourse against LLC A, whose

COMPLAINT AND JURY DEMAND - PAGE 16

1    investment income and sale of real estate assets was to serve as the primary

2    repayment source for the loan.

3    b.    Failed to monitor, evaluate, and consider market conditions.  Although the

4          repayment sources for the loan were investment income and LLC A's sale of

5          real estate investments, the Loan Memo presented only limited information on

6          market conditions that was focused on the sale of the residence that was

7          pledged as collateral rather than on the repayment sources, including the

8          Streamline Tower project and the Las Vegas real estate market.

9    c.    Failed to consider the inadequacy of the collateral.  The Loan Memo described

10         the collateral as the former personal residence of one of the borrowers and

11         $4,602,000 in restricted shares in O.D. Fisher, a private investment company.

12         The Loan Memo contained red flags showing that the proposed collateral was

13         insufficient to secure the loan.  For example, although the Loan Memo stated

14         that the borrower had listed the house for sale for $2,100,000, it showed that

15         $900,000 of the loan proceeds were to be used to pay off a mortgage held by

16         Key Bank.  The sale of the house, therefore, would only "net $1,200,000."  The

17         Loan Memo also noted that the purchase price of the property in 2000 was only

18         $814,950 and the 2008 tax assessed value of the property was only $1,112,000.

19         In addition, the Loan Memo requested that an appraisal of the residence be

20         waived, even though the residence was "in the process of being appraised."

21         These statements in the Loan Memo were red flags that should have prompted

22         further due diligence by the Defendants on this loan regarding the residence

23         pledged as collateral.  Had the Defendants on this loan performed or required

24         even a minimal amount of due diligence into the residence, they would

25         discovered that the borrower had not yet "listed the house with Windermere for

COMPLAINT AND JURY DEMAND - PAGE 17

$2,100,000" and that the "listed" price was, in fact, merely an anticipated asking price. As to the O.D. Fisher shares, the Loan Memo valued them at $4,602,000, even though the shares were "restricted and w[ould] not be sold to repay the loan," and thus were of no real value to the Bank. The Loan Memo acknowledged that a loan "[w]eakness" was "[c]losely held stock not liquid," meaning that the shares, while having impressive value on paper, provided no real security for the loan. Other than acknowledging that the pledged shares would not be sold to repay the loan, the Loan Memo contained no analysis of the risks relating to that collateral or how those shares would contribute to adequately securing the loan. Notwithstanding these glaring red flags, the Loan Memo calculated the LTV ratio for the loan based on the *full* $2,100,000 anticipated asking price of the residence and the *full* $4,602,000 purported value of the restricted stock, and the Defendants on this loan approved the loan without requiring additional collateral or analysis.

d.   Failed to evaluate the inadequacy of the collateral for the loan, including the high LTV ratio for the loan, and recommended or approved the loan notwithstanding the inadequate collateral. The Loan Memo stated that the LTV ratio for this loan was 82%, which exceeded the 70% LTV ratio limit, but it failed to explain why an exception to the Loan Policy was warranted. As to the residence, the Loan Memo presented the anticipated asking price of $2.1 million and requested to waive an appraisal. An appraisal completed on October 26, 2007, four days after the ELC approved the Borrowers A-C loan but before it was disbursed, valued the residence at only $1.55 million, which was $550,000 less than the value presented in the Loan Memo. The LTV ratio for the loan was 82% based on the higher valuation of the residence presented

COMPLAINT AND JURY DEMAND - PAGE 18

1     in the Loan Memo plus the O.D. Fisher stock, and 89.4% based on the lower

2     appraised value of the residence plus the value of the O.D. Fisher stock.  Both

3     LTV ratios exceeded the Bank's LTV limit.

4     59.    The deficient underwriting and credit analysis was apparent from the Loan Memo and

5 supporting materials provided to the ELC.  Had the Defendants on this loan insisted on the required

6 underwriting and credit analysis, it would have demonstrated, among other things, that there was no

7 adequate source of repayment, the repayment sources identified were speculative and vulnerable to

8 a deteriorating housing market, the borrowers' creditworthiness did not support the loan amount, the

9 collateral was illiquid and overvalued in the Loan Memo, the LTV ratio exceeded the Loan Policy

10 limit, and the Borrowers A-C loan should not have been approved.

11     60.    In or about February 2009, Borrowers A, B, and C defaulted on the loan.  The

12 supposed investment income and the sale of the real estate holdings were insufficient to repay the

13 loan.

14     61.    As a result of the actions and inactions of Defendants J. Dickson, Dorsey, Ries,

15 Robinson, and Ryan with respect to the Borrowers A-C loan, Frontier incurred damages in an

16 amount to be proved at trial.

17     ***LLC A (I)***

18     62.    On or about April 9, 2008, on the recommendation of Dorsey, DLC members

19 DeYoung and Zenger purported to approve a $5.5 million Construction Loan for LLC A and

20 Borrower C (the "LLC A (I) loan").  The LLC A (I) loan was not considered at a regularly-

21 constituted DLC meeting or approved by a quorum of the DLC, as the Loan Policy required for all

22 loans that required DLC approval.  In addition, the LLC A (I) loan was closed and partially funded

23 on or about March 31, 2008, which was nine days before DeYoung and Zenger purportedly

24 approved the LLC A (I) loan.

25

COMPLAINT AND JURY DEMAND - PAGE 19

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

1     63.    From about April 9, 2008 through March 2009, the Bank disbursed approximately

2    $3,252,979 of the LLC A (I) loan.

3     64.    The Loan Memo for the LLC A (I) loan stated that the purpose of the loan was to

4    provide contingency funds to LLC A for four development projects on which Frontier had first

5    liens.

6     65.    The Loan Memo provided that the primary and secondary repayment sources were to

7    be, in order, the sale of real estate assets from all projects and Borrower C's personal investment

8    income.

9     66.    The Loan Memo also provided that the LLC A (I) loan would be unsecured.

10     67.    In recommending or approving the LLC A (I) loan, Defendants DeYoung, Dorsey, and

11    Zenger, among other things:

12          a.    Failed to monitor, evaluate, and consider market conditions. For example,

13              although the Loan Memo identified "Sale of real estate assets from all

14              projects" (*i.e.*, real estate investment returns) as the primary source of

15              repayment for the loan, the Loan Memo contained only cursory information

16              regarding real estate market conditions and no real analysis. Indeed, the Loan

17              Memo acknowledged that "the current flat market for sale of lots, which is the

18              primary source of repayment from 3 of the related plats, *may delay repayment.*

19              It is likely on completion of the Fenner plat[,] house construction may

20              commence. House sales are moderately improving." (Emphasis added.)

21              Beyond this acknowledgement that real estate investment returns were a risky

22              source of repayment, the Loan Memo included no meaningful analysis of the

23              "flat market," any basis for the lukewarm assertion that sales were "moderately

24              improving," or any other analysis regarding market conditions, which directly

25

COMPLAINT AND JURY DEMAND - PAGE 20

1    affected the borrowers' ability to repay the loan.  This lack of meaningful

2    analysis in the Loan Memo was a red flag to DeYoung and Zenger.

3    68.    The deficient underwriting and credit analysis was apparent from the Loan Memo and

4    the lack of any collateral to secure this $5.5 million Construction Loan.  Had the Defendants on this

5    loan insisted on the required underwriting and credit analysis, it would have demonstrated, among

6    other things, that there was no adequate source of repayment, the repayment sources identified were

7    speculative and vulnerable to a deteriorating housing market, there was no collateral securing the

8    loan, and the LLC A (I) loan should not have been approved.

9    69.    In or about March 2009, LLC A and Borrower C defaulted on the LLC A (I) loan.

10   The sale of real estate was insufficient to repay the loan.

11   70.    As a result of the actions and inactions of Defendants DeYoung, Dorsey, and Zenger

12   with respect to the LLC A (I) loan, Frontier incurred damages in an amount to be proved at trial.

13   *LLC A (II)*

14   71.    On or about April 9, 2008, DeYoung and Zenger also purported to approve an

15   additional $2.0 million Construction Loan for LLC A (the "LLC A (II) loan").  The LLC A (II) loan

16   was not considered at a regularly-constituted DLC meeting or approved by a quorum of the DLC, as

17   the Loan Policy required for all loans that required DLC approval.  In addition, the LLC A (II) loan

18   was closed on or about March 31, 2008 and partially funded on or about April 1, 2008, which was

19   eight days before DeYoung and Zenger purportedly approved the LLC A (II) loan.

20   72.    On or about April 11, 2008, the Bank disbursed approximately $500,000 of the LLC A

21   (II) loan.

22   73.    The Loan Memo for the LLC A (II) loan stated that the purpose of the LLC A (II) loan

23   was to provide working capital for LLC A's real estate investment portfolio.

24

25

COMPLAINT AND JURY DEMAND - PAGE 21

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

74.     The Loan Memo provided that the primary and secondary repayment sources for the LLC A (II) loan were to be, in order, the refinance and sale of assets in LLC A's real estate portfolio and the guarantors' stock portfolios and incomes.

75.     The Loan Memo also provided that the LLC A (II) loan would be unsecured.

76.     In approving the loan, Defendants DeYoung and Zenger, among other things:

   a.     Failed to monitor, evaluate, and consider market conditions.  Although the Loan Memo identified refinance and sale of real estate assets as the primary source of repayment for the loan, the Loan Memo only listed assets that were for sale without providing any analysis regarding local real estate market conditions, such as information or analysis regarding vacancy rates, permitting trends, valuation trends, or other economic indicators that were essential to evaluating whether the refinance and sale of real estate assets were viable repayment sources for the loan.  This lack of meaningful analysis in the Loan Memo was a red flag to DeYoung and Zenger.

77.     The deficient underwriting and credit analysis was apparent from the Loan Memo and the lack of any collateral to secure this $2.0 million Construction Loan.  Had the Defendants on this loan insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate source of repayment, the repayment sources identified were speculative and vulnerable to a deteriorating housing market, there was no collateral securing the loan, and the LLC A (II) loan should not have been approved.

78.     In or about April 2009, LLC A defaulted on the LLC A (II) loan.  The loan was not refinanced by a third party, and the assets in LLC A's real estate portfolio and the guarantors' stock portfolios and incomes were insufficient to repay the loan.

79.     As a result of the actions and inactions of Defendants DeYoung and Zenger with respect to the LLC A (II) loan, Frontier incurred damages in an amount to be proved at trial.

COMPLAINT AND JURY DEMAND - PAGE 22

***Borrower D (I)***

80.     On or about November 5, 2007, Dorsey recommended and the ELC, including DeKlyen, J. Dickson, Ries, Robinson, and Ryan, presented to the DLC for approval a $3.8 million Construction Loan for LLC B, which was owned by Borrower D (the "Borrower D (I) loan"). On or about November 7, 2007, the DLC, including DeYoung, J. Dickson, Lucas, and Zenger, approved the Borrower D (I) loan. The DLC approved the loan to Borrower D, but the loan ultimately was made to LLC B with Borrower D as the guarantor. This loan was approved even though Borrower D already had total liabilities to Frontier in excess of $28.4 million. Both the Loan Memo and the DLC minutes stated that Borrower D's total liabilities to Frontier, including the Borrower D (I) loan, exceeded $32.2 million.

81.     On or about December 5, 2007, the Bank disbursed approximately $3,776,000 of the Borrower D (I) loan.

82.     The Loan Memo for the Borrower D (I) loan stated that the purpose of the loan was to pay off an existing loan with Frontier, replenish Borrower D's cash flow, and provide Borrower D with working capital for various ongoing real estate projects. On the face of the Loan Memo, the purpose of this loan was speculative and unsound.

83.     The Loan Memo provided that the primary, secondary, and tertiary repayment sources were to be, in order, "Payment from contract receivable," income or sale of other assets, and conversion of the collateral.

84.     The Loan Memo also provided that the Borrower D (I) loan would be secured by two assigned notes and second deeds of trust on two commercial buildings known as the Willows in Kirkland, Washington. The first deeds of trust secured a $10.7 million loan from G.E. Capital.

85.     In recommending, presenting for approval, and/or approving the Borrower D (I) loan, Defendants DeKlyen, DeYoung, J. Dickson, Dorsey, Lucas, Ries, Robinson, Ryan, and Zenger, among other things:

COMPLAINT AND JURY DEMAND - PAGE 23

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

a.   Failed to require more than a vague and cursory analysis of the primary source of repayment – the "Payment from contract receivable." The Loan Memo failed to even identify the specific contract upon which the receivables were due. If the "contract receivable" was the amount owed on the two notes for the two Willows commercial buildings that served as collateral for the loan, the Loan Memo provided only a minimal amount of information and analysis regarding those notes. The aggregate monthly payments receivable under the two notes was only $131,000, and the notes did not mature until August and September 2015, respectively. The term of the Borrower D (I) loan, which was made in November 2007, was only 24 months. Even if every contract receivable was received on time, the primary source of repayment still would have been insufficient to repay the loan.

b.   Failed to consider the guarantor's, *i.e.*, Borrower D's, lack of sufficient creditworthiness and his inability to support the loan, including, but not limited to, his limited liquidity and income and his high leverage. The Loan Memo stated that, although Borrower D had a self-reported net worth of $306 million and liquid assets of $33 million, he also had over $100 million of liabilities described as "friends and family investments." Even minimal diligence or requests for supporting information would have shown that these liabilities were notes that were payable on demand, meaning that the redemption of even one third of the outstanding value of these notes would have instantly rendered Borrower D insolvent. His illiquid assets, which consisted of notes receivables, "contracts owned," real estate, and land held for development, would not really have been available to support the loan if LLC B defaulted. In addition, the Loan Memo stated that Borrower D had AGIs of *negative*

COMPLAINT AND JURY DEMAND - PAGE 24

1
$42,226,500 in 2006, *negative* $72,565,100 in 2005, and *negative* $81,995,500

2
in 2004.  The Loan Memo described Borrower D's negative AGIs as resulting

3
from business losses and/or loss carryovers.

4
    c.    Failed to consider and evaluate the inadequacy of the collateral for the loan,

5
including the high LTV ratio for the loan.  Although the Loan Memo stated

6
that the LTV ratio was 70% based on the "net margined equity" of $3.776

7
million, this loan was approved in the amount of exactly $3.776 million, the

8
precise amount of the "[t]otal margined collateral value" that was calculated

9
and shown in the Loan Memo.  Therefore, the real LTV ratio was 100%, which

10
violated the applicable LTV limit.

11
    86.    The deficient underwriting and credit analysis was apparent from the Loan Memo and

12
other materials provided to the ELC and DLC.  Had the Defendants on this loan insisted on the

13
required underwriting and credit analysis, it would have demonstrated, among other things, that

14
there was no adequate source of repayment, the repayment sources identified were speculative and

15
vulnerable to a deteriorating housing market, the contract receivables were insufficient to repay the

16
loan, the guarantor could not support the loan, the LTV ratio exceeded the Loan Policy limit, and

17
the Borrower D (I) loan should not have been approved.

18
    87.    In or about February 2009, LLC B defaulted on the Borrower D (I) loan.  The contract

19
receivables, Borrower D's income and other assets, and the collateral were insufficient to repay the

20
loan.

21
    88.    As a result of the actions and inactions of Defendants DeKlyen, DeYoung, J. Dickson,

22
Dorsey, Lucas, Ries, Robinson, Ryan, and Zenger with respect to the Borrower D (I) loan, Frontier

23
incurred damages in an amount to be proved at trial.

24

25

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

*Borrower D (II)*

89.     On or about February 4, 2008, Dorsey recommended and the ELC, including DeKlyen, J. Dickson, Ries, Robinson, and Ryan, presented a $3.0 million Construction Loan for Borrower D (the "Borrower D (II) loan") to the DLC for approval. On or about February 13, 2008, the DLC, including Clementz, J. Dickson, R. Dickson, Lucas, and Zenger, approved the Borrower D (II) loan. This loan was approved even though the Loan Memo and the DLC minutes stated that Borrower D's total liabilities to Frontier, including the Borrower D (II) loan, exceeded $32.1 million.

90.     On or about March 3, 2008, the Bank disbursed essentially the entire Borrower D (II) loan.

91.     The Loan Memo for the Borrower D (II) loan stated that the purpose of the loan was to fund improvements on recently acquired commercial real estate.

92.     The Loan Memo provided that the primary, secondary, and tertiary repayment sources were to be, in order, rental income, other income or assets of the borrower, and conversion of the collateral.

93.     The Loan Memo also provided that the Borrower D (II) loan would be secured by a second deed of trust on four office buildings in Bellevue, Washington.

94.     In recommending, presenting for approval, and/or approving the Borrower D (II) loan, Defendants Clementz, DeKlyen, J. Dickson, R. Dickson, Dorsey, Lucas, Ries, Robinson, Ryan, and Zenger, among other things:

a.      Failed to monitor, evaluate, and consider market conditions. Although the primary repayment source for the loan was to be rental income from the property, the Loan Memo was devoid of, and the Defendants on this loan failed to request, any analysis of market conditions, leasing trends in the area, or other issues that could affect the project or the likelihood that the Bank would

COMPLAINT AND JURY DEMAND - PAGE 26

1    be repaid for the loan through rental income.  According to the Loan Memo,

2    the debt coverage ratio ("DCR") was 1.0, which means that the property was

3    generating barely enough income to pay its debt obligations, and was bordering

4    on a negative cash flow.  The Loan Memo requested approval of an exception

5    to the Loan Policy for this low DCR.  The Loan Memo identified Borrower D's

6    income as a justification for this exception, even though Borrower D had

7    reported negative AGIs for the previous *three years*, as discussed in

8    subparagraph 85(b) above.

9    b.   Failed to consider the borrower's lack of sufficient creditworthiness as

10        described in subparagraph 85(b) above.

11   c.   Failed to consider and evaluate the inadequacy of the collateral for the loan,

12        including the high LTV ratio for the loan, and recommended or approved the

13        loan notwithstanding the inadequate collateral.  Under the Loan Policy, the

14        LTV limit for this type of Construction Loan was 70%, but the Loan Memo

15        disclosed that the LTV ratio for this loan based on the purchase price of the

16        property was 91.9% and the LTV ratio based on the "as-is" value of the

17        property was 80%.  The LTV ratio based on an appraised value after

18        improvements was 70.5%.  Although the Loan Memo requested exceptions

19        from the Loan Policy with respect to the LTV limit violations, there was no

20        basis for granting these exceptions given the severe deficiencies in the

21        borrower's financial condition and the size of his total liabilities to Frontier, as

22        discussed above.

23   95.   The deficient underwriting and credit analysis was apparent from the Loan Memo and

24   other materials provided to the ELC and DLC.  Had the Defendants on this loan insisted on the

25   required underwriting and credit analysis, it would have demonstrated, among other things, that

COMPLAINT AND JURY DEMAND - PAGE 27

1   there was no adequate source of repayment, the repayment sources identified were speculative and

2   vulnerable to a deteriorating real estate market, the borrower could not support the loan, an

3   exception was not warranted for the LTV and debt coverage ratios, and the Borrower D (II) loan

4   should not have been approved.

5       96.   In or about February 2009, Borrower D defaulted on the Borrower D (II) loan.  The

6   rental income, Borrower D's other income and assets, and the collateral were insufficient to repay

7   the loan.

8       97.   As a result of the actions and inactions of Defendants Clementz, DeKlyen, J. Dickson,

9   R. Dickson, Dorsey, Lucas, Ries, Robinson, Ryan, and Zenger with respect to the Borrower D (II)

10  loan, Frontier incurred damages in an amount to be proved at trial.

11  **_Borrower D (III)_**

12      98.   On or about March 24, 2008, Dorsey recommended and the ELC, including J.

13  Dickson, Dorsey, Ries, Robinson, and Ryan, presented a $22.0 million Construction Loan for

14  Borrower D (the "Borrower D (III) loan") to the DLC for approval.  On or about March 26, 2008,

15  the DLC, including Clementz, DeYoung, J. Dickson, Lucas, and Zenger, approved the Borrower D

16  (III) loan. This loan was approved even though the Loan Memo and the DLC minutes stated that

17  Borrower D's total liabilities to Frontier, including the Borrower D (III) loan, exceeded $53.8

18  million.

19      99.   Between March 2008 and March 2009, the Bank disbursed approximately $19,655,984

20  of the Borrower D (III) loan.

21      100.  The Loan Memo for the Borrower D (III) loan stated that the purpose of the loan was

22  to finance the purchase of 13.53 acres and the construction costs of two two-story commercial

23  buildings.

24

25

COMPLAINT AND JURY DEMAND - PAGE 28

101. The Loan Memo provided that the primary, secondary, and tertiary repayment sources were to be, in order, the proceeds from permanent financing, income or sale of the borrower's assets, and conversion of the collateral.

102. The Loan Memo also provided that the Borrower D (III) loan would be secured by a first deed of trust on the Sammamish Ridge Tech Center in Redmond, Washington.

103. In recommending, presenting for approval, and/or approving the Borrower D (III) loan, Defendants Clementz, DeYoung, J. Dickson, Dorsey, Lucas, Ries, Robinson, Ryan, and Zenger, among other things:

    a.    Failed to consider the prospects for third-party financing. The Loan Memo described proceeds from permanent financing as the primary repayment source, however, it was devoid of any evaluation of refinancing prospects, challenges, or other relevant information. The Defendants on this loan, therefore, had no information upon which to judge the availability of third-party financing. The request in the Loan Memo also failed to include a take-out commitment from a third-party lender, as required by the Loan Policy.

    b.    Failed to consider the borrower's lack of sufficient creditworthiness as described in subparagraph 85(b) above.

    c.    Failed to consider and evaluate the inadequacy of the collateral for the loan, including the high LTV ratio for the loan, and recommended or approved the loan notwithstanding the inadequate collateral. For this type of Construction Loan, the Loan Policy established a 70% LTV ratio limit. Based on the appraised at-completion value of the collateral, the Loan Memo stated that the LTV ratio was 75%, which exceeded the Loan Policy LTV limit. Based on the other significant deficiencies in this loan identified above and the absence of

COMPLAINT AND JURY DEMAND - PAGE 29

1   any valid compensating factors, there was no basis warranting an exception to

2   the Loan Policy for this LTV ratio violation.

3      104.   The deficient underwriting and credit analysis was apparent from the Loan Memo and

4   other materials provided to the ELC and the DLC.  Had the Defendants on this loan insisted on the

5   required underwriting and credit analysis, it would have demonstrated, among other things, that

6   there was no adequate source of repayment, the repayment sources identified were speculative and

7   vulnerable to a deteriorating housing market, there was no take-out commitment from a third-party

8   lender, the borrower could not support the loan, the LTV ratio exceeded the Loan Policy limit, and

9   the Borrower D (III) loan should not have been approved.

10      105.   In or about March 2009, Borrower D defaulted on the Borrower D (III) loan.  The loan

11   was not financed by a third party, and Borrower D's income and other assets and the collateral were

12   insufficient to repay the loan.

13      106.   As a result of the actions and inactions of Defendants Clementz, DeYoung, J. Dickson,

14   Dorsey, Lucas, Ries, Robinson, Ryan, and Zenger with respect to the Borrower D (III) loan,

15   Frontier incurred damages in an amount to be proved at trial.

16   ***GMP***

17      107.   On or about May 30, 2007, the ELC, including DeKlyen, J. Dickson, Ries, Robinson,

18   and Ryan, presented a $17.0 million Construction Loan for GMP Homes Zocalo, LLC (the "GMP

19   loan") to the DLC for approval.  On or about June 6, 2007, the DLC, including Clementz, J.

20   Dickson, R. Dickson, Lucas, Storkson, and Zenger, approved the GMP loan.

21      108.   Between June 2007 and May 2008, the Bank disbursed approximately $15,438,778 of

22   the GMP loan.

23      109.   The Loan Memo for the GMP loan stated that the purpose of the loan was to enable

24   GMP Homes Zocalo, LLC to complete the development of the Altura Townhomes project in

25   Bothell, Washington, which was designed to be a 93-unit development to be built in three phases.

COMPLAINT AND JURY DEMAND - PAGE 30

1    The loan was to fund the development of phases 2 and 3 of the project and to pay down a loan for

2    phase 1 of the project, which encompassed 33 townhouse units.

3         110.   The Loan Memo provided that the sole repayment source was to be the sale of the

4    completed condominiums.

5         111.   The Loan Memo also provided that the GMP loan would be secured by a first deed of

6    trust on the Altura Townhomes property.

7         112.   In approving and/or presenting for approval the GMP loan, Defendants Clementz,

8    DeKlyen, J. Dickson, R. Dickson, Lucas, Ries, Robinson, Ryan, Storkson, and Zenger, among other

9    things:

10            a.     Failed to monitor, evaluate, and consider market conditions.  Although the

11                   Loan Memo described the sole repayment source as the "sale of completed

12                   condo units," it included only cursory references to market conditions that

13                   were relevant to the sale of those units, such as stating that "[t]his project is in

14                   a good location – and is in a marketable price range."  The Loan Memo was

15                   devoid of any meaningful analysis as to local market conditions, inventory, or

16                   other trends that would affect the sale of condominium units and the repayment

17                   of the loan.

18            b.     Failed to consider and evaluate the inadequacy of the collateral for the loan,

19                   including the high LTV ratio.  The LTV ratio for the loan exceeded the limit

20                   established by Frontier's Loan Policy for this type of loan.  The Loan Memo

21                   described the LTV ratio as 74.3% based on retail value and 83.6% based on

22                   discounted value at completion, both of which exceeded the applicable LTV

23                   limit of 70%.  Although the Loan Memo identified the violation of the LTV

24                   limit as a requested exception to the Bank's Loan Policy, the Loan Memo was

25                   devoid of any analysis of or support for that exception.  Furthermore, the

COMPLAINT AND JURY DEMAND - PAGE 31

1    discussions of this loan reflected in the minutes of the ELC and the DLC failed

2    to identify any justification for this exception.

3    c.    Failed to consider the guarantors' lack of sufficient creditworthiness and

4    inability to support the loan, including, but not limited to, their limited liquidity

5    and income and their high leverage.  One guarantor was a principal of the

6    borrower and the other was the principal's spouse.  Minutes from the ELC and

7    DLC meetings at which the GMP loan was approved stated that, including the

8    $17 million GMP loan, the total related liability in amounts owed to Frontier

9    was more than $57 million.  The Loan Memo acknowledged the guarantors'

10   high debt, stating: "We realize this is a high amount of debt for [one of the

11   guarantors] . . . .  We would like to accommodate [that guarantor] to continue

12   on to the final two phases of this project."  The minutes from the ELC and

13   DLC meetings at which this loan was reviewed and approved also described

14   "High debt level[s]" and "High debt concerns[,]" respectively.  This debt

15   dwarfed the amount of the guarantors' assets that would be available to support

16   those loans.  In fact, the guarantors' financial statements confirmed that they

17   had very limited liquidity, with only $79,500 in cash.  The guarantors'

18   remaining assets were in real estate and other illiquid assets.  The guarantors'

19   financial statement also evidenced a history of limited, and even negative,

20   income.  The financial statement showed that the guarantors' adjusted gross

21   income ("AGI") was *negative* $155,800 in 2005, $282,800 in 2004, and

22   $123,000 in 2003.  Even the guarantors' highest AGI in this period – $282,800

23   in 2004 – was only 1.66% of the $17 million GMP loan and 0.496% of the

24   guarantors' total $57 million in total related liabilities to Frontier.

25

COMPLAINT AND JURY DEMAND - PAGE 32

1    113.  The deficient underwriting and credit analysis was apparent from the Loan Memo and

2   other materials provided to the ELC and DLC.  Had the Defendants on this loan insisted on the

3   required underwriting and credit analysis, it would have demonstrated, among other things, that

4   there was no adequate source of repayment, the repayment source identified was speculative and

5   vulnerable to a deteriorating housing market, the guarantors could not support the loan, and the

6   GMP loan should not have been approved.

7    114.  In or about May 2008, GMP Homes Zocalo, LLC defaulted on the GMP loan.  The

8   sale of the condominium units did not cover the loan.

9    115.  As a result of the actions and inactions of Defendants Clementz, DeKlyen, J. Dickson,

10   R. Dickson, Lucas, Ries, Robinson, Ryan, Storkson, and Zenger with respect to the GMP loan,

11   Frontier incurred damages in an amount to be proved at trial.

12   ***IH High Street***

13    116.  On or about May 8, 2007, the ELC, including DeKlyen, J. Dickson, Ries, and

14   Robinson, presented a $6.2 million Construction Loan for High Street 10 & 11, LLC (renamed IH

15   High Street, LLC) (the "IH High Street loan") to the DLC for approval.  On or about May 9, 2007,

16   the DLC, including DeYoung, R. Dickson, Lucas, Storkson, and Zenger, approved the IH High

17   Street loan.  On or about August 18, 2008, the ELC, including DeKlyen, J. Dickson, Ries, and

18   Robinson approved a $442,115 increase to the IH High Street loan.

19    117.  By January 2, 2009, the Bank had disbursed approximately $6,510,720 of the IH High

20   Street loan.

21    118.  The original Loan Memo for the IH High Street loan (the "May 2007 Loan Memo")

22   stated that the purpose of the loan was to enable IH High Street, LLC to acquire property and fund

23   the development of 12 condominiums in Issaquah Highlands, Washington.  The Loan Memo for the

24   August 2008 modification of the IH High Street loan (the "July 2008 Loan Memo") was prepared in

25

COMPLAINT AND JURY DEMAND - PAGE 33

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

1  July 2008 and stated that the purpose of the modification was to enable IH High Street, LLC to

2  complete construction on the IH High Street project.

3    119.  The May 2007 Loan Memo provided that the sole repayment source was to be the sale

4  of the completed condominium units.  The July 2008 Loan Memo provided that the repayment

5  sources were to be, in order, the net sales from the completed condominium units and the

6  liquidation of the assets of the guarantors, which were the principal of the borrower and the

7  principal's wholly owned limited liability company, LLC C, which was the developer of the

8  property.

9    120.  Both Loan Memos provided that the IH High Street loan would be secured by a first

10  deed of trust on the IH High Street property.

11    121.  In approving and/or presenting for approval the IH High Street loan, Defendants

12  DeKlyen, DeYoung, J. Dickson, R. Dickson, Lucas, Ries, Robinson, Storkson, and Zenger, among

13  other things:

14    a.    Failed to monitor, evaluate, and consider market conditions.  The sale of the

15    completed condominium units was the primary repayment source for the loan.

16    Even though only 2 of the 12 units in the IH High Street project were under

17    contract for sale, the May 2007 Loan Memo stated, without explanation or

18    analysis, that it was "anticipated that within the next 120 days virtually all of

19    Frontier Bank's current loans [to the borrower] will be paid off."  The May

20    2007 Loan Memo also projected a seven-month construction period with sales

21    completed within five months after construction, which, on its face, was

22    unrealistic in light of the known softening of the local real estate market and

23    violated the Loan Policy's requirement to consider the risk of completion date

24    overruns.  The May 2007 Loan Memo's cursory analysis of market conditions

25    focused on LLC C's experience and success as a developer, but lacked any

COMPLAINT AND JURY DEMAND - PAGE 34

1    meaningful analysis of market conditions related to the IH High Street project,

2    such as sales trends, inventory, and other issues.  Moreover, the May 2007

3    Loan Memo's optimistic sales projections came three months after Robinson

4    had received a report from Real Estats that, among other things, quoted a

5    statement by *The Wall Street Journal* that "[v]acant U.S. homes for sale have

6    climbed to their highest level in four decades, sparking fresh concerns about

7    the housing market."  Even though the project relied on real estate market

8    stability, and despite indications of a downturn in the real estate market, the

9    May 2007 Loan Memo failed to evaluate any risks associated with real estate

10   market fluctuations, and the Defendants on this loan did not request or obtain

11   revisions to the Loan Memo analyzing these issues.  The dangers of these

12   market risks were apparent by the time of the August 2008 loan modification,

13   as reflected in the July 2008 Loan Memo, which revised the number of units

14   under contract for sale from two to zero.

15   b.  Failed to consider and evaluate the inadequacy of the collateral for the loan,

16   including the high LTV ratio for the loan.  The May 2007 Loan Memo stated

17   that the LTV ratio was 74.7% based on an $8,268,000 valuation of the

18   collateral at completion by an appraiser who was not on the Bank's approved

19   list.  The May 2007 Loan Memo also calculated an LTV ratio of 84.1% based

20   on the $7,346,000 discounted value of the collateral at completion, and an LTV

21   ratio of 90.0% based on the $6,871,221 "cost value" of the collateral.  All three

22   of these LTV ratios exceeded the applicable LTV limit of 70%.  The minutes

23   from the ELC and DLC meetings at which this loan was reviewed and

24   approved also stated, "LTV discussed."  The May 2007 Loan Memo, however,

25   was devoid of any assessment of real estate market conditions that would have

COMPLAINT AND JURY DEMAND - PAGE 35

1                justified such an exception.  The July 2008 Loan Memo listed the discounted

2                value as $6,100,000 and provided an LTV ratio of 109%.

3       c.    Failed to consider the borrower's and guarantors' lack of sufficient equity in

4                the project.  The May 2007 Loan Memo stated that $687,122 in borrower or

5                guarantor equity was required for the loan, but also noted that the borrower and

6                guarantors had in fact invested only $284,067 in the IH High Street project,

7                which was only 4% of the amount of the loan, well below the Loan Policy's

8                requirement that the borrower or guarantor possess 10% equity in the project.

9       d.    Failed to consider the borrower's and guarantors' lack of sufficient

10              creditworthiness and inability to support the loan, including, but not limited to,

11              their high leverage and concentration of assets in real estate.  The minutes of

12              the meeting at which the ELC approved the IH High Street loan for

13              presentation to the DLC stated: "Borrower is leveraged.  Financials discussed."

14              The minutes showed "Total Related Liability (If Approved)" of $18,128,598

15              for the borrower and the two guarantors of the IH High Street loan, which were

16              the principal of the borrower and LLC C.  LLC C was identified as holding

17              only approximately $1 million in cash (about 16% of the loan amount) and was

18              highly concentrated in real estate, making LLC C an unreliable guarantor in the

19              event of a softening housing market.  Excluding the principal's interest in LLC

20              C, the principal's financial statement reflected a net worth of only $289,750,

21              which constituted only 1.6% of the $18,128,598 in total related liabilities,

22              including the IH High Street loan.  Moreover, the principal's cash holdings

23              were only $10,100, which equaled only 0.056% of the $18,128,598 total

24              related liabilities.  The combined cash holdings of LLC C and its principal

25              were $1,015,780, which equaled only 5.6% of the $18,128,598 total related

COMPLAINT AND JURY DEMAND - PAGE 36

1
2
3
4
5
6
7
8
9

liabilities, including the IH High Street loan. Due to their lack of liquidity, the guarantors could not sufficiently support the loan. By July 2008, the borrower's creditworthiness had deteriorated to the point that the July 2008 Loan Memo recommended downgrading the IH High Street loan to a 6 "as the borrower[']s ability to continue making interest payments [wa]s in doubt." Under the Loan Policy, a grade of 6 meant the "possibility of loss [wa]s extremely high." The Loan Policy further described a grade-6 loan as a loan with "no liquidity, highly leveraged, lack of adequate guarantor support, questionable collateral coverage with liquidation likely."

10   122.   The deficient underwriting and credit analysis was apparent from the Loan Memos and
11  other materials provided to the ELC and DLC. Had the Defendants on this loan insisted on the
12  required underwriting and credit analysis, it would have demonstrated, among other things, that
13  there was no adequate source of repayment, the repayment sources identified were speculative and
14  vulnerable to a deteriorating housing market, the guarantors could not support the loan, and the IH
15  High Street loan should not have been approved.

16   123.   In or about February 2009, IH High Street, LLC defaulted on the IH High Street loan.
17  The sale of the condominium units and the assets of the guarantors were insufficient to repay the
18  loan.

19   124.   As a result of the actions and inactions of Defendants DeKlyen, DeYoung, J. Dickson,
20  R. Dickson, Lucas, Ries, Robinson, Storkson, and Zenger with respect to the IH High Street loan,
21  Frontier incurred damages in an amount to be proved at trial.

22   *LLC D (I)*

23   125.   On or about May 21, 2007, the ELC, including DeKlyen, J. Dickson, Ries, Robinson,
24  and Ryan, presented a $4.5 million raw land acquisition loan for LLC D (the "LLC D (I) loan") to
25

COMPLAINT AND JURY DEMAND - PAGE 37

1    the DLC for approval.  On or about May 23, 2007, the DLC, including DeYoung, J. Dickson, R.

2    Dickson, Lucas, Storkson, and Zenger, approved the LLC D (I) loan.

3        126.  Between June 2007 and August 2008, the Bank disbursed almost all of the LLC D (I)

4    loan.

5        127.  The Loan Memo for the LLC D (I) loan stated that the purpose of the loan was to

6    enable LLC D to acquire a 15-acre site in Bothell, Washington and to cover a portion of expenses

7    already incurred for the development of that property.

8        128.  The Loan Memo provided that the primary and secondary repayment sources were to

9    be, in order, a separate acquisition and development loan from another lender and the sale of lots.

10       129.  The Loan Memo also provided that the LLC D (I) loan would be secured by a first

11   deed of trust on the LLC D (I) property.

12       130.  In approving and/or presenting for approval the LLC D (I) loan, Defendants DeKlyen,

13   DeYoung, J. Dickson, R. Dickson, Lucas, Ries, Robinson, Ryan, Storkson, and Zenger, among

14   other things:

15           a.    Failed to consider the prospects for third-party financing.  The Loan Memo

16                 identified project refinancing (an "A & D loan") from a third-party as the

17                 primary repayment source, but no such refinancing had yet been secured and

18                 the Loan Memo was devoid of any evaluation of refinancing prospects,

19                 challenges, or other relevant information regarding whether refinancing was in

20                 fact available.  The Defendants on this loan, therefore, had no information

21                 upon which to judge the availability of third-party financing.  Analysis of

22                 refinancing prospects would have shown that, given the other deficiencies in

23                 the loan and the softening housing market, the borrower was unlikely to secure

24                 refinancing.

25

COMPLAINT AND JURY DEMAND - PAGE 38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

b.   Failed to monitor, evaluate, and consider market conditions. The ostensible secondary repayment source for the loan was "sale of lots to third party purchaser," but the Loan Memo failed to identify any such purchaser and presented almost no information or analysis regarding the real estate market conditions in the lending area indicating that such sales were likely or at what prices. The Loan Memo stated only that it was "more than likely the site will be sold to a large builder who would do the actual installation of the infrastructure," but was devoid of any analysis supporting that assertion. Furthermore, the lack of analysis of market conditions was particularly egregious because the Loan Memo failed to include an LTV ratio based on a completed appraisal.

c.   Failed to consider and evaluate the inadequacy of the collateral for the loan, including the high LTV ratio for the loan. The Loan Memo acknowledged that no appraisal had been completed, but then estimated a 57% LTV ratio based only on an "anticipated value" of the collateral. The minutes from the ELC and DLC meetings at which this loan was reviewed and approved also stated, "Good LTV." In reality, the LTV ratio based on the budgeted acquisition cost for this raw land loan exceeded 100%, in violation of the Loan Policy's 65% LTV limit for raw land acquisition loans.

131.   The deficient underwriting and credit analysis was apparent from the Loan Memo and other materials provided to the ELC and DLC. Had the Defendants on this loan insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate source of repayment, the repayment sources identified were speculative and vulnerable to a deteriorating housing market, the project was unlikely to be refinanced, the local real

COMPLAINT AND JURY DEMAND - PAGE 39

1   estate market was deteriorating, the collateral was insufficient to secure the loan, and the LLC D (I)

2   loan should not have been approved.

3       132. In or about November 2008, LLC D defaulted on the LLC D (I) loan. The loan was

4   not refinanced by a third party, and the sale of the lots was insufficient to repay the loan.

5       133. As a result of the actions and inactions of Defendants DeKlyen, DeYoung, J. Dickson,

6   R. Dickson, Lucas, Ries, Robinson, Ryan, Storkson, and Zenger with respect to the LLC D (I) loan,

7   Frontier incurred damages in an amount to be proved at trial.

8   **_LLC D (II)_**

9       134. On or about November 15, 2007, the ELC, including J. Dickson, Ries, and Robinson,

10   approved and presented to the DLC a $3,107,500 Construction Loan for LLC D (the "LLC D (II)

11   loan"). On or about November 28, 2007, the DLC, including Clementz, DeYoung, R. Dickson,

12   Lucas, and Zenger, approved the LLC D (II) loan.

13       135. Between November 2007 and August 2008, the Bank disbursed the entire $3,107,500

14   of the LLC D (II) loan.

15       136. The Loan Memo for the LLC D (II) loan stated that the purpose of the loan was to

16   provide an interest reserve for other Frontier-financed real estate loans to LLC D. On the face of the

17   Loan Memo, the purpose of this loan was speculative and unsound.

18       137. The Loan Memo provided that the primary and secondary repayment sources were to

19   be, in order, development and/or construction loans from third parties and the sale of properties

20   securing a second deed of trust.

21       138. The Loan Memo also provided that the LLC D (II) loan would be secured by a second

22   deed of trust on three properties on which Frontier already had first deeds of trust.

23       139. In approving and/or presenting for approval the LLC D (II) loan, Defendants

24   Clementz, DeYoung, J. Dickson, R. Dickson, Lucas, Ries, Robinson, and Zenger, among other

25   things:

COMPLAINT AND JURY DEMAND - PAGE 40

a.   Failed to consider the prospects for third-party financing. The Loan Memo identified development and/or construction loans as the primary repayment source, but was devoid of any evaluation of refinancing prospects, challenges, or other relevant information regarding whether third-party loans were available. The Defendants on this loan, therefore, had no information upon which to judge the availability of third-party financing. Analysis of refinancing prospects would have shown that, given the other deficiencies in the loan and the softening housing market, the borrower was unlikely to secure loans from third parties.

b.   Failed to monitor, evaluate, and consider market conditions. Despite the importance of lot sales as the secondary repayment source, the Loan Memo failed to offer any quantitative analysis of relevant market conditions, instead offering only anecdotal references to likely housing trends. Furthermore, the Loan Memo acknowledged that "qualified home buyers have been reluctant to buy at this time." The 75% LTV ratio on the LLC D (II) project exceeded the applicable 70% LTV limit. Moreover, the minutes of the meeting at which the DLC approved the LLC D (II) loan acknowledged that "[l]ot prices are coming down due to extremely slow sales. Builders are delaying new projects. . . . Need to watch all existing projects very closely." In addition, less than one month prior to approving the LLC D (II) loan, Ries wrote to the publisher of Real Estats, "do you think that you could find any positive information out there to report, the doom and gloom is getting old." The day before the DLC approved the LLC D (II) loan, an email from Real Estats to Ries included a comment that the areas in and around Seattle where LLC D was active "show[ed] continued deceleration in returns." Despite these warnings about

COMPLAINT AND JURY DEMAND - PAGE 41

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

1    the declining real estate market and the fact that lot sales were essential to the

2    repayment of the loan, the DLC approved the LLC D (II) loan without

3    conducting the required diligence regarding the impact of market conditions on

4    the loan.

5    140.   The deficient underwriting and credit analysis was apparent from the Loan Memo and

6    other materials provided to the ELC and DLC.  Had the Defendants on this loan insisted on the

7    required underwriting and credit analysis, it would have demonstrated, among other things, that

8    there was no adequate source of repayment, the repayment sources identified were speculative and

9    vulnerable to a deteriorating housing market, the borrower was unlikely to obtain third-party

10   financing, and the LLC D (II) loan should not have been approved.

11   141.   In or about November 2008, LLC D defaulted on the LLC D (II) loan.  The loan was

12   not refinanced by a third party, and the collateral was insufficient to repay the loan.

13   142.   As a result of the actions and inactions of Defendants Clementz, DeYoung, J. Dickson,

14   R. Dickson, Lucas, Ries, Robinson, and Zenger with respect to the LLC D (II) loan, Frontier

15   incurred damages in an amount to be proved at trial.

16   ***LLC E***

17   143.   On or about March 12, 2007, the ELC, including J. Dickson, Ries, Robinson, and

18   Ryan, presented a $10.3 million Construction Loan for LLC E (the "LLC E loan") to the DLC for

19   approval.  On or about March 14, 2007, the DLC, including DeYoung, J. Dickson, R. Dickson,

20   Lucas, and Zenger, approved the LLC E loan.

21   144.   Between June 2007 and November 2009, the Bank disbursed approximately

22   $6,030,247 of the LLC E loan.

23   145.   The Loan Memo for the LLC E loan stated that the purpose of the loan was to enable

24   LLC E to purchase approximately 20.9 acres of land and develop 75 residential real estate lots as

25

COMPLAINT AND JURY DEMAND - PAGE 42

1   part of the Harvest Hills and Harvest Pond real estate projects in Marysville, Washington.  Harvest

2   Hills contained 71 lots, and Harvest Pond contained the remaining 4 lots.

3       146.   The Loan Memo provided that the primary, secondary, and tertiary repayment sources

4   were to be, in order, the proceeds from the sale of the lots in 2008, third-party refinancing for the

5   project, and the liquid assets of the personal guarantors, who were principals of the borrower.

6       147.   The Loan Memo provided that the LLC E loan would be secured by a first deed of

7   trust on the LLC E property.

8       148.   In approving and/or presenting for approval the LLC E loan, Defendants DeYoung, J.

9   Dickson, R. Dickson, Lucas, Ries, Robinson, Ryan, and Zenger, among other things:

10          a.      Failed to monitor, evaluate, and consider market conditions.  While the Loan

11                  Memo stated  that "[t]he appraisal was found to be acceptable to the bank," it

12                  omitted any evaluation of real estate market conditions in Marysville, even

13                  though the primary repayment source was to be the sale of the lots in 2008.

14                  Moreover, the Loan Memo described a 78% LTV ratio based on the appraised

15                  discounted value at completion of $13,165,000.  The 78% LTV ratio exceeded

16                  the applicable LTV limit of 70%.  Although the Loan Memo requested an

17                  exception from the Loan Policy for the high LTV ratio, the Loan Memo was

18                  devoid of any assessment of real estate market conditions that would have

19                  justified such an exception.  The Loan Memo stated only that "[t]his

20                  authorization is requesting an advance exception of 78%, which is over the

21                  supervisory limit for the bank."

22          b.      Failed to consider or analyze the prospects for third-party financing for the

23                  project even though "Refinance of Project" was the ostensible secondary

24                  repayment source.  The Loan Memo was devoid of any evaluation of

25                  refinancing prospects, options, challenges, or other relevant information or

COMPLAINT AND JURY DEMAND - PAGE 43

1    analysis regarding whether refinancing was in fact available.  The Defendants

2    on this loan, therefore, had no information upon which to judge the availability

3    of third-party financing.

4    c.    Failed to consider the guarantors' lack of sufficient creditworthiness and

5    inability to support the loan, including, but not limited to, their limited income

6    and liquidity and their high leverage.  The guarantors had adjusted gross

7    incomes in 2005 of only $191,800 and $113,300, respectively, and combined

8    cash assets of only $2,020,800.  In addition, the guarantors had personal and

9    business liabilities in excess of $3 million, which significantly exceeded their

10   combined cash assets.

11   149.  The deficient underwriting and credit analysis was apparent from the Loan Memo and

12   supporting materials provided to the ELC and the DLC.  Had the Defendants on this loan insisted on

13   the required underwriting and credit analysis, it would have demonstrated, among other things, that

14   there was no adequate source of repayment, the repayment sources identified were speculative and

15   vulnerable to a deteriorating housing market, third-party financing was unlikely, the guarantors

16   could not support the loan, and the LLC E loan should not have been approved.

17   150.  In or about July 2009, LLC E defaulted on the LLC E loan.  The project was not

18   refinanced by a third party, and the proceeds from the sale of the lots and the assets of the personal

19   guarantors were insufficient to repay the loan.

20   151.  As a result of the actions and inactions of Defendants DeYoung, J. Dickson, R.

21   Dickson, Lucas, Ries, Robinson, Ryan, and Zenger with respect to the LLC E loan, Frontier

22   incurred damages in an amount to be proved at trial.

23

24

25

COMPLAINT AND JURY DEMAND - PAGE 44

1

2

# V.   CAUSES OF ACTION

## COUNT I – BREACH OF FIDUCIARY DUTIES
### (All Defendants)

3

4

152.  The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-151 above as if fully set out in this Count.

5

6

7

153.  As officers and/or directors of the Bank, at all times, the Defendants owed to Frontier the fiduciary duties of care and loyalty, which required them to exercise their powers in good faith and in a manner reasonably believed to be in the best interests of the Bank.

8

9

10

11

12

13

154.  Defendants' fiduciary duties included, among other things: conducting the business of Frontier in a manner consistent with safe and sound lending practices; using prudent procedures for recommending, presenting for approval, and/or approving loans; recommending, presenting for approval, and/or approving loans in accordance with Frontier's Loan Policy; acting with the requisite care in the discharge of their duties; and informing themselves, prior to making business decisions, of all the material information reasonably available to them.

14

15

16

17

18

19

155.  For each loan, the material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV ratio, the risks associated with the downturn in the real estate market, and any other information necessary to ensure that the proposed loan complied with Frontier's Loan Policy and prudent, safe, and sound lending practices.

20

21

156.  Frontier reasonably reposed trust and confidence in each of the Defendants and believed they would exercise the trust and confidence reposed in them with great care.

22

23

24

25

157.  The Defendants each knew or should have known that the Bank was placing its trust and confidence in them, and the Bank did place its trust and confidence in each of them, as demonstrated by the fact that each of the Defendants was an officer and/or a director of the Bank and had the responsibility to recommend, present for approval, and/or approve loans.  Trust and

COMPLAINT AND JURY DEMAND - PAGE 45

1  confidence was also placed in the Defendants either because they assisted in preparing, publicizing,

2  and enforcing the terms of the Bank's Loan Policy, or because each of them read and agreed to

3  follow the Bank's Loan Policy.

4      158.   With respect to the Loans, each of the Defendants possessed significant access to

5  relevant knowledge and facts due to each Defendant's special position of power at the Bank and the

6  confidence each Defendant invited others to repose in him or her with respect to such Loans, based

7  on the fact that each Defendant actively engaged in the recommendation, presentation for approval,

8  and/or approval of the Loans.

9      159.   As officers and/or directors of the Bank, and as individuals recommending, presenting

10  for approval, and/or approving the Loans, each of the Defendants was in a special position of

11  influence and power, and each of them exercised that influence and power in a manner that directly

12  caused harm to the Bank.

13      160.   The Defendants breached their fiduciary duties to the Bank by committing the acts and

14  omissions alleged above.

15      161.   As a direct and proximate result of the Defendants' breaches of their fiduciary duties,

16  Plaintiff has suffered damages in excess of $46 million.  Plaintiff reserves the right to amend this

17  Complaint to describe additional damages.

18                          **COUNT II – GROSS NEGLIGENCE**
                                    **(All Defendants)**
19                      **(Pleaded in the Alternative to Count I)**

20      162.   The FDIC-R re-alleges and incorporates by reference the allegations contained in

21  paragraphs 1-151 above as if fully set out in this Count.

22      163.   Under Washington law and 12 U.S.C. § 1821(k), as officers and/or directors of the

23  Bank, the Defendants can be held personally liable for damages to Frontier caused by their gross

24  negligence.

25

COMPLAINT AND JURY DEMAND - PAGE 46

164. As officers and/or directors of the Bank, at all times, the Defendants owed to Frontier a duty to use care, skill, and diligence in the performance of their duties as officers and/or directors of Frontier.

165. The Defendants' duty of care to Frontier included, among other things: conducting the business of Frontier in a manner consistent with safe and sound lending practices; using prudent procedures for recommending, presenting for approval, and/or approving loans; recommending, presenting for approval, and/or approving loans in accordance with Frontier's Loan Policy; and informing themselves, prior to making business decisions, of all the material information reasonably available to them.

166. For each loan, the material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV ratio, the risks associated with the downturn in the real estate market, and any other information necessary to ensure that the proposed loan complied with Frontier's Loan Policy and prudent, safe, and sound lending practices.

167. The Defendants breached their duties and were grossly negligent by committing the acts and omissions alleged above.

168. As a direct and proximate result of the Defendants' gross negligence, Plaintiff has suffered damages in excess of $46 million. Plaintiff reserves the right to amend this Complaint to describe additional damages.

## COUNT III – NEGLIGENCE
**(Officers DeKlyen, J. Dickson, Dorsey, Ries, Robinson, and Ryan)**

169. The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-151 above as if fully set out in this Count.

170. Under Washington law, as officers of the Bank, the Officers can be held personally liable for damages to Frontier caused by their negligence.

COMPLAINT AND JURY DEMAND - PAGE 47

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711

171.   As officers of the Bank, at all times, the Officers owed to Frontier a duty to use care, skill, and diligence in the performance of their duties as officers of Frontier.

172.   The Officers' duty of care to Frontier included, among other things: conducting the business of Frontier in a manner consistent with safe and sound lending practices; using prudent procedures for recommending, presenting for approval, and/or approving loans; recommending, presenting for approval, and/or approving loans in accordance with Frontier's Loan Policy; and informing themselves, prior to making business decisions, of all the material information reasonably available to them.

173.   For each loan, the material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV ratio, the risks associated with the downturn in the real estate market, and any other information necessary to ensure that the proposed loan complied with Frontier's Loan Policy and prudent, safe, and sound lending practices.

174.   The Officers breached their duties and were negligent by committing the acts and omissions alleged above.

175.   As a direct and proximate result of the Officers' negligence, Plaintiff has suffered damages in excess of $46 million.  Plaintiff reserves the right to amend this Complaint to describe additional damages.

## VI.   **RELIEF REQUESTED**

WHEREFORE, the FDIC-R demands a trial by jury and judgment in its favor and against the Defendants as follows:

COMPLAINT AND JURY DEMAND - PAGE 48

1     **A.**     Determining the amount of damages caused by the Defendants;

2     **B.**     Determining the amount of accrued interest (including pre-judgment interest) on such

3 damages;

4     **C.**     Awarding the FDIC-R the full amount of damages and accrued interest;

5     **D.**     Awarding the FDIC-R its costs and other expenses incurred by it in connection with

6 this proceeding; and

7     **E.**     Granting the FDIC-R such other and further relief as this Court may deem just and

8 proper under the circumstances.

9                           **VII.**     **JURY DEMAND**

10        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a trial by

11 jury.

12

13                         Respectfully Submitted,

14 Dated:  April 26, 2013.        **ATER WYNNE LLP**

15

16                         By: */s/ Stephen J. Kennedy*

17                         Stephen J. Kennedy, WSBA No. 16341
                         sjk@aterwynne.com

18                         601 Union Street, Suite 1501
                         Seattle, WA 98101-3981

19                         Telephone:  (206) 623-4711
                         Fax:  (206) 467-8406

20                         James B. Davidson, WSBA No. 33847
                         jbd@aterwynne.com

21                         1331 NW Lovejoy Street, Suite 900
                         Portland, OR 97209-2785

22                         Telephone:  (503) 226-1191
                         Fax:  (503) 226-0079

23

24                         **ATTORNEYS FOR PLAINTIFF**

25

ATER WYNNE LLP
LAWYERS
601 UNION STREET, SUITE 1501
SEATTLE, WA 98101-2341
(206) 623-4711